WALKER TRANSPORTATION COM-
PANY, Inc., Appellant,

v.

John E. NEYLON, Appellee.

No. 19059.

United States Court of Appeals
Eighth Circuit.

June 27, 1968.

Walter R. James of James, McFarland
& Trimble, North Kansas City, Mo., for
appellant.

Patrick E. Hartigan of Margolin &
Kirwan, Kansas City, Mo., for appellee;
F. Philip Kirwan, of Margolin & Kirwan,
Kansas City, Mo., and Baylor, Evnen,
Baylor & Urbom, Lincoln, Neb., Stern,

Harris, Feldman & Becker, Omaha, Neb., and James E. Ryan, Lincoln, Neb., were on the brief.

Before MEHAFFY, GIBSON and HEANEY, Circuit Judges.

FLOYD R. GIBSON, Circuit Judge.

The District Court for the Western District of Missouri granted specific performance of a contract to purchase an ICC Certificate of Public Convenience and Necessity. The holder of the Certificate and defendant below, Walker Transportation Company, Inc., formerly Kansas-Nebraska Xpress, Inc. appeals.[1] This is a diversity case in a requisite jurisdictional amount, and Missouri law applies. It is undisputed that the ICC Certificate MC–986 is of such a unique character as to invoke the equity jurisdiction of the Court.

The defendant, Walker Transportation Company, Inc., became insolvent in 1958 and agreed through its president and sole stockholder, (except for qualifying shares) John Walker, to sell all of its stock to Chief Freight Lines in consideration of Chief assuming liabilities of defendant in the amount of $65,000. The ICC Hearing Examiner recommended that this sale and control transaction be not approved. Chief was utilizing this Certificate under a lease rental of $400 per month.

The Interstate Commerce Commission will not authorize the transfer of a dormant certificate, and the defendant upon failing to secure the Commission's approval to the Chief's sale was pressed to find another immediate prospective purchaser. This it did in the person of the plaintiff, John E. Neylon, d/b/a Neylon Bros. Freight Lines, but at a considerably reduced consideration. An agreement was prepared by the attorneys for the respective parties and was entered into under date of August 19, 1960, providing in part: For a purchase price of $1.00 for motor vehicles and office equipment[2] and

"* * * an additional sum required to settle in full all outstanding accounts payable of said corporation [Seller] but not exceeding the total amount of Thirty Thousand Dollars ($30,000) to be paid to Seller after an agreement in writing from all creditors showing satisfaction of all accounts payable for an amount not exceeding Thirty Thousand Dollars ($30,000) is obtained by the Seller and on the effective date of a final order of the Interstate Commerce Commission authorizing the Buyer to purchase said operating authority."

The contract further provided that if the ICC granted Neylon a temporary operating license he would pay the defendant $200 per month rental, which amount was to be credited on the purchase price. Neylon obtained the required temporary license and paid the defendant $200 per month from November 1960 to June 1966, a total of $13,400. Shortly after the execution of the purchase contract John Walker was employed by Neylon as comptroller and remained in Neylon's employment until June 1966.

After execution of the above contract and as required by the ICC regulations, Tom Kretsinger, who was an officer of the defendant and also Mr. Walker's attorney, submitted a joint application on behalf of the parties to the ICC, seeking the agency's approval of the contract and a temporary authority for Neylon to operate under defendant's Certificate.

In addition to the application for the transfer, an application was filed to convert Neylon's intrastate operating rights in Nebraska into an interstate certificate.[3] It was this phase of the transac-

---

1. The parties will be referred to as they were designated in the trial court or by an appropriate name reference.

2. Though the contract mentions other chattels, the only asset of the defendant corporation according to its letter to creditors, was the ICC Certificate.

3. The ICC will generally approve a conversion of intrastate operating rights into an ICC Certificate purchased as a result of an approved sale when the intrastate operating rights are clearly defined and not ambiguous or tenuous. A proceeding for an ICC authorization to purchase is

tion which caused the delay in the consummation of the contract as Neylon claimed broader operating rights than appeared warranted by his actual intrastate operation. These rights were later narrowed and definitely set forth by the Nebraska courts, which matter is not material to the issues in this case.[4]

On February 13, 1962, the Examiner's report was entered recommending denial of the purchase application for various reasons: overreaching by the vendee (Neylon), the purchase price was not shown to be fair and reasonable, the contract was not the result of negotiations or of arm's length bargaining, and as stated in the Examiner's ultimate Findings and Order " * * * the transaction * * * has not been shown to be fair and reasonable or consistent with the public interest. * * *" Neylon and the defendant filed exceptions to the Hearing Examiner's report, and at the same time entered into a new contract under date of April 18, 1962, denominated as "Supplemental Agreement", designed to meet the objections of the Hearing Examiner.

On January 24, 1963 the ICC, through its Finance Review Board, reversed the Examiner, sustained the exceptions to the Examiner's Findings and Order and gave a conditioned approval to the 1960 contract. The Finance Review Board also found it unnecessary to consider the agreement of April 18, 1962 (which it had been requested by the parties to do), holding it was unnecessary to a decision on the merits of the proposed transaction. This left the parties with a conditioned approval of the 1960 agreement.[5] No effort was thereafter made to secure the ICC's approval of the 1962 contract, which would have been necessary in the

---

said to take a year and one-half to three years, depending upon whether exceptions are taken to the Hearing Examiner's recommended order.

4. The 1960 contract provided that:
" * * * if the registration of Buyer's Nebraska State Railway Commission authority under the so-called 'Second Proviso Section' of the Interstate Commerce Act shall be jeopardized in any manner or form then this contract shall be null and void and of no further force and effect, provided, however, that this condition shall not apply in the event that a certificate of public convenience and necessity authorizing operating rights, the same as or broader than Buyers 'registered' rights, is issued by the Interstate Commerce Commission in lieu of Buyer's registration."

The District Court did not feel that the lengthy legal proceedings concerning the intrastate rights had any bearing on the merits of this case. We are inclined to agree because the parties proceeded to operate and take steps toward consummating the purchase after it became apparent by the ICC order of August 15, 1963 that Neylon's irregular route in Nebraska was ambiguous and the ICC would only approve the intrastate routes as defined by the Nebraska State Railway Commission and the Nebraska courts. We view this provision, if it has any relevancy at all, as a clause inserted by Neylon which may be waived by him or which was waived by the tacit agreement of the parties in taking the steps necessary to secure an approval of the sale contract and a consummation of the sale.

A party for whose benefit a provision is inserted in a contract may waive it. Robertson v. Energy Const. Co., 294 S.W. 426 (Mo.App.1927); and as expressed in 17 Am.Jur.2d, Contracts § 390: "Strict and full performance of a contract by one party may be waived by the other party, * * * This is in accord with the elementary general principle that either party to a contract may waive any of the provisions made for his benefit."

5. The conditions imposed by the ICC for approval of the contract and transfer of the ICC Certificate in connection therewith were:
1. Neylon could not pay in excess of $30,000 for the operating rights, etc. and settlement of claims against defendant;
2. If Neylon had to borrow any money to finance the purchase he could not pay more than 6 per cent interest;
3. A time limitation was imposed, (which is immaterial in this suit);
4. Restrictions were placed on the use of the ICC Certificate by eliminating service to or from St. Joseph, Missouri; the defendant's irregular route was canceled; and the right to transport explosives was for five years only;
5. The ICC refused to convert most of Neylon's Nebraska irregular route general commodities authority by reason

event the parties desired to proceed under the 1962 contract.

The order approving the transfer had been kept alive by repeated applications for extensions, pending litigation in the State of Nebraska to interpret and define Neylon's intrastate rights in order that they may be converted into ICC authority and tied in with this Certificate. During the period of April 1962 to May 1966 John Walker and Neylon worked together in processing the various applications and proceedings necessary to consummate the 1960 contract; and also work together in operating Neylon Bros. Transportation Company under defendant's Certificate, utilizing the temporary authorization granted in 1960. In the interim many of the defendant's outstanding accounts payable were compromised and settled and in February 1966 Neylon paid a judgment obtained against the defendant to prevent the judgment creditor from levying on the defendant's Certificate.

On February 9, 1966 Neylon's litigation in the State of Nebraska was concluded. The ICC had extended the authority to purchase and lease to July 1, 1966. Neylon invited John Walker to meet with him on May 31, 1966 to determine how their transaction might be consummated but Walker refused this invitation and quit his employment with Neylon on June 1, 1966. On June 22, 1966 Walker informed Neylon that he intended to resume operations under the Certificate on July 1, 1966 when Neylon's lease authority expired.

The defendant resumed operations under its Certificate on July 1, 1966 and on the same day received written notice from Neylon that Neylon elected to consummate the purchase of the Certificate. Suit was then instituted by Neylon in the United States District Court and, after a hearing, a temporary injunction was issued on July 29, 1966, restraining the defendant from operating under the Certificate. A hearing on the merits re-

sulted in the trial court entering a decree of specific performance.

The defendant's initial contention is that the original complaint was based on the 1962 contract, which contained a clause giving Neylon the option to purchase within sixty days after a final determination was had on his Nebraska operating rights. Final determination was had on February 28, 1966 and Neylon failed to exercise his option within the contract period. Defendant apparently takes the position that the 1962 contract had superseded the 1960 contract and the Court, therefore, was in error in decreeing specific performance of a superseded contract.

The plaintiff contends the 1962 contract was abandoned when the ICC Finance Review Board gave conditioned approval to the 1960 contract and that the 1960 contract, as conditioned by the ICC, was accepted by the parties and was used as the basis of the parties' actions and attempts to consummate the sale agreement.

We do not think the 1962 contract superseded the 1960 contract. After the ICC refused to consider the 1962 contract and gave a conditioned approval to the 1960 contract the parties made no further effort to obtain approval of the 1962 contract, even though they knew that they could not consummate the 1962 contract without the Commission's approval.

Whether the parties abandoned the 1962 contract is essentially a question of fact. An abandonment may be accomplished by an expressed mutual consent or by implied consent to the actions of the parties. Schwartz v. Shelby Construction Company, 338 S.W.2d 781, 787–788 (Mo.1960). And as noted in 17 Am.Jur.2d, Contracts, § 484:

"The abandonment of a contract is a matter of intention to be ascertained from the facts and circumstances surrounding the transaction from which the abandonment is claimed to have re-

of the fact that they were ambiguous but by later order granted the right to open the ICC proceedings to modify

its earlier order, if justified, to convert whatever rights the Nebraska Railway Commission might say that Neylon had.

sulted. An abandonment of a contract need not be express but may be inferred from the conduct of the parties and the attendant circumstances."

It is apparent from the record that the parties abandoned the 1962 contract after the ICC refused to consider it, and the trial court's finding of fact in this regard is not only "not clearly erroneous" but is supported by the probative evidence in the case. This finding is dispositive of defendant's contention that the 1962 contract superseded the 1960 contract and that the parties had abandoned the 1960 contract. The parties expressly advanced the 1960 contract as a viable contract before the ICC by filing exceptions to the Hearing Examiner's Report. The 1962 Supplemental Contract was a hedge in case their exceptions were not recognized by the ICC Finance Review Board. When the Board approved the 1960 contract and refused to consider the 1962 contract, the parties took no appeal on the 1962 contract issue and of necessity would have to drop the 1962 agreement as it was subject to ICC approval.

The parties by their actions demonstrated that they were proceeding under some type of agreement. This agreement by necessity would have to be the 1960 contract as conditioned by the ICC as this was the only contract capable of consummation. The primary purpose of the parties' agreement and of their actions in relation thereto were to consummate the purchase and sale of the ICC Certificate and the effectuation of some pro rata distribution to the creditors of the defendant. Neylon continued to pay the $200 monthly lease fee that was to be applied to defendant's debts; the parties joined in seeking clarification and definition of Neylon's Nebraska intrastate rights and also co-operated in securing the assignment and settlement of some of the claims against the defendant.[6] Neylon with the acquiescence and probable assent of Walker, paid and secured an assignment of the judgment claim against defendant in the amount of $4547 in order to protect the ICC Certificate against a judicial execution.

As phrased in 17 Am.Jur.2nd, Contracts, § 20:

"The manifestation or expression of assent necessary to form a contract may be by word, act, or conduct which evinces the intention of the parties to contract. * * * Conduct may be as effective as words in manifesting mutual assent to a contract, and consent may be implied from acts or sometimes may be indicated by silence or inaction."

■ It is apparent from the evidence that the parties did not intend to abrogate the 1960 contract by their execution of the 1962 Supplemental Contract as they filed and pursued their exceptions to the ICC Hearing Examiner's Report on the 1960 contract. Under these circumstances the parties evidenced their primary intention to consummate a purchase of the ICC Certificate by way of the 1960 contract or the 1962 Supplemental Contract if no relief were accorded on their exceptions relating to the 1960 contract. Relief was accorded and the 1962 Supplemental Contract was no longer needed and lost its viability upon the refusal of the ICC Board to consider it. After the ICC reversed the Hearing Examiner and gave a conditioned approval to the 1960 contract and refused to consider the 1962 Supplemental Contract the parties acquiesced in this finding and continued to pursue their primary objective of the lease and purchase of the ICC Certificate. The 1962 Supplemental Contract had to be abandoned as the parties had not obtained ICC approval, had not appealed the ICC order refusing to consider that contract and had not instituted any further proceedings to effectuate the 1962 contract.

■ The defendant has alleged numerous other allegations of error relating to the sufficiency of the evidence and to the legality and enforceability of the

6. Neylon had secured compromises and assignments of over $38,000 of the defendant's debts in addition to the $4547 payment for the assignment of a judgment.

1960 contract without specific reference to the points of law concerned. "Points which simply invite the court to search the record for error present no question for decision by this court." Koolvent Metal Awning Corp. of America v. Bottom, 205 F.2d 209, 214 (8 Cir. 1953); Anderson v. Federal Cartridge Corporation, 156 F.2d 681, 683 (8 Cir. 1946).

Another contention made is that the trial court erred in granting specific performance because Neylon materially breached the contract by not securing a composition of defendant's creditors. This position is difficult to fathom as under the terms of the 1960 contract[7] it was the defendant's responsibility to obtain the composition of creditors.

Defendant also questions whether there was any enforceable contract of sale and purchase, contending the consideration or price was not definitely stated and the assent of the creditors was necessary to scale the debts of the defendant down to within the figure set forth in the contract. It relies on the Eighth Circuit case of Fremon v. W. A. Sheaffer Pen Co., 209 F.2d 627, 632 (1954), which approved a citation from Richmond Screw Anchor Co. v. Umbach, 173 F.2d 532, 534 (7 Cir. 1949), "Where an essential element of a contract is reserved for future agreement, no legal obligation as to such element arises until such future agreement is made." .

■ The 1960 contract is not so lacking in essential parts or so uncertain or indefinite in its terms, see Bellows v. Porter, 201 F.2d 429 (8 Cir. 1953), that

it is incapable of or not entitled to enforcement. The decree consummates the contract in accord with the intention of the parties and effects a composition of the creditors pro rata—aided in part by an effected composition and completed by the passage of time.

Defendant was obligated to furnish a complete list of the creditors so that a composition of their claims within the framework of the contract could be made, or at least attempted. This it failed to do. But the running of the statute of limitations has made this issue moot. Creditors not previously composed or paid will, after taxes, receive a pro rata payment regardless of the running of limitations.

■ Defendant's final contention is that plaintiff's inequitable conduct foreclosed his right to the equitable remedy of specific performance.

Nine reasons are cited in defendant's brief of why specific performance should be denied, along with case law citation of Koolvent Metal Awning Corp. of America v. Bottom, supra, which gave effect to the familiar maxim that a plaintiff with unclean hands has no standing in a court of equity and must himself be free from inequitable conduct in connection with the contract sought to be enforced. The general equitable principles recognized in *Koolvent* are certainly available for application but the factual reasons asserted by the defendant are too general and vague, or inaccurate, to warrant this Court as a matter of law in holding that they constitute inequitable conduct.[8]

7. The pertinent part of Clause No. 1 of the 1960 agreement reads:
   1. " * * * the total amount of Thirty Thousand Dollars ($30,000) to be paid to Seller after an agreement in writing from all creditors showing satisfaction of all accounts payable for an amount not exceeding Thirty Thousand Dollars ($30,000) *is obtained by the Seller* [Defendant] * * *" (Emphasis supplied)

8. No purpose would be served by detailing all of the reasons set forth by defendant but in item 1 defendant claims plaintiff "has rendered no performance." Obviously there has been partial perform-

ance and a tender of full performance. In item 2 defendant alleges that "plaintiff has taken advantage of defendant's insolvency to substantially defraud the creditors of their claims." This is a very broad and condemnatory charge. Plaintiff has expended cash in purchasing the judgment and has secured a substantial composition of the creditors. In addition the court's decree reserves the balance of a $30,000 purchase price after payment of taxes, expenses and a judgment obligation, for the benefit of defendant's remaining creditors.

In item 3 defendant complains of inadequate consideration as found by the ICC

The defendant was represented throughout the entire transaction by competent counsel who was also interested in the outcome as a Director of the defendant. The record discloses and the trial court found that the defendant cooperated with the plaintiff (which defendant was obligated to do by the 1960 contract) toward the consummation of the contract and had acquiesced in the extensions of time for consummation of the contract requested of and granted by the ICC.

The trial court considered the contentions of the defendant and found adversely to it. We are not persuaded by the assertions of inequitable conduct though we realize that not all equities rest with the plaintiff. The plaintiff has, however, made considerable expenditures, has succeeded in building up the value of the ICC Certificate, has partially performed and has tendered full performance of the contract. It is apparent from the record that the defendant had become insolvent while operating under the ICC Certificate but that the Certificate was capable of providing a profitable operation. This is evidenced by the Chief's lease and purchase agreement and by Neylon's operations. Neylon under the purchase and lease agreement had admittedly built up the Certificate into a valuable asset. Both parties recognize that all of the claims except taxes and judgment claims were barred by the statutes of limitations and each complained that the other would get a windfall if he or it prevailed in this proceeding. The trial court, however, in its equitable discretion decreed that the purchase price of $30,000 less payments made to creditors and an amount necessary to satisfy tax claims, should be distributed pro rata to the creditors of the defendant regardless of the statute of limitations. The original intent of the 1960 contract is being fully carried into effect by the equitable decree entered in this case. The trial court balanced the equities and found the equities substan-tially in favor of the plaintiff. It fashioned a decree that is fair to all the parties, including the creditors of defendant, and which does equity.

■ "This form of Relief (specific performance) is not a matter of absolute right to either party; it is a matter resting in the discretion of the court, to be exercised upon a consideration of all the circumstances of each particular case." Willard v. Taylor, 75 U.S. (8 Wall.) 557, 19 L.Ed. 501 (1869).

The trial court has exercised discretion in applying equitable principles in formulating its decree of specific performance; and has fulfilled the equitable principles noted in 2 Pomeroy's Equity Jurisprudence, 5th Ed. § 414, p. 162:

"'In examining into the relative merits (or equities) of two parties having adverse equitable interests, the points to which the court must direct its attention are obviously these: the nature and condition of their respective equitable interests, the circumstances and manner of their acquisition, and the whole conduct of each party with respect thereto. And in examining into these points, it must apply the test, not of any technical rule, or any rule of partial application, but the same broad principles of right and justice which a court of equity applies universally in deciding upon contested rights.'"

■ The function of this Court in this type of case is to see that the determination of the trial court is (1) not induced by a misconception or misapplication of the local law, Western Casualty & Surety Co. v. Coleman, 186 F.2d 40, 43 (8 Cir. 1950); National Bellas Hess, Inc. v. Kalis, 191 F.2d 739 (8 Cir. 1951), cert. denied 342 U.S. 933, 72 S.Ct. 377, 96 L.Ed. 695; and (2) that the court's factual findings are not "clearly erroneous." Fed.R.Civ.P. 52(a); North American Van Lines, Inc. v. Brown, 248 F.2d 905 (8 Cir. 1957).

Examiner but this finding was reversed by the ICC Finance Review Board. Other reasons stated are merely forecasts if specific performance were granted.

As stated in North American Van Lines, supra at 914:

"We take that view of the evidence which is most favorable to the prevailing party and this Court will not set aside a finding of fact of a trial court unless there is no substantial evidence to sustain it, unless it is against the clear weight of the evidence, or unless it was induced by an erroneous view of the law." (Citations omitted).

The defendant has not demonstrated a misconception of or misapplication of the applicable law by the trial court, nor has it shown the factual determinations to be clearly erroneous.

Judgment of the trial court decreeing specific performance is affirmed.