In the Matter of Daniel Martin
HUMMEL and Gladys Darlene
Hummel, Debtors.

William H. BURDEN, Jr., and Inn of
Southwest Missouri, Inc., Plaintiffs,

v.

Daniel Martin HUMMEL and Gladys
Darlene Hummel, Defendants.

Bankruptcy No. 80–00106–SW–11.
Adv. No. 81–0223–SW–11.

United States Bankruptcy Court,
W. D. Missouri, Southwestern Division.

July 2, 1982.

George Baldridge, Joplin, Mo., for plaintiffs.

James F. B. Daniels, Joplin, Mo., for defendants.

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND FINAL DECREE AND JUDGMENT THAT THE PLAINTIFF INN OF SOUTHWEST MISSOURI, INC., RESTORE TO DEFENDANTS THE SUM OF $20,958.27

DENNIS J. STEWART, Bankruptcy Judge.

This action was commenced by the plaintiffs Burden and the Inn of Southwest Missouri, Inc., as a complaint for relief from the automatic stay with respect to the real property and improvements in Joplin, Missouri, then known as Hummel Inn. The defendants answered the complaint, con-

testing the plaintiffs' claim of right to relief from the automatic stay and also, as part of their answer, filed a counterclaim against the plaintiff Inn of Southwest Missouri, Inc., seeking actual and punitive damages for alleged breaches of an express warranty by the plaintiff Inn of Southwest Missouri, Inc., of certain structural and mechanical components of the physical premises.

 The court, as is required by § 362(e) of the Bankruptcy Code, conducted an early hearing on the complaint for relief from the automatic stay, severing and reserving trial and decision on the issues made by the counterclaim until a later date. This was in keeping with the modern authorities which are to the effect that the counterclaims and other claims joined with a complaint for relief from the automatic stay may be postponed while the question of relief from the stay is accorded immediate trial and decision.[1] After the court had conducted its hearing on the merits of the plaintiffs' complaint for relief from the automatic stay, the defendant debtors filed, on May 20, 1981, a written modification of their chapter 11 plan of reorganization which, in pertinent part, provided as follows:

"Inn of Southwest Missouri, Inc., shall as of the date of this amendment receive the right to immediate possession of the leasehold premises located at 2600 Range Line Road, Joplin, Missouri, together with any and all equipment, furniture, furnishings and fixtures in which this creditor can claim a valid and perfected security interest, and the unencumbered inventory located on said premises. As of the effective date of the Plan and pursuant to the Order of confirmation to be entered herein, the debtors shall surrender to the Inn of Southwest Missouri, Inc., as the indubitable equivalent of said creditor's claims, all of the right, title and interest of the debtors in such property, both real and personal."

On the same date, May 20, 1981, the debtors also filed a "disclosure statement under 11 U.S.C. § 1125," in which they, as is here pertinent, described their debtor-creditor relationship with the Inn of Southwest Missouri, Inc., as follows:

"The Inn of Southwest Missouri, Inc., [is a creditor] with respect to two promissory notes of the debtors dated March 10, 1980, in the original amount of $900,000.00 and $150,000.00, respectively. Both instruments are secured by a second deed of trust upon the debtors' interest in the leasehold premises located at 2600 Range Line Road, Joplin, Missouri, presently known as the Hummel Inn. For purposes of satisfying the claims of this creditor, the sums now owing on the foregoing obligations are to be subdivided as follows:

(1) $889,554.50, representing the balance due on the original $900,000.00 note as of May 11, 1981, after discounting all current maturities;

(2) $84,053.14, representing current maturities on the $900,000.00 note as of May 11, 1981;

(3) $150,000.00, representing the principal balance now due on the original $150,000.00 note; and

(4) $14,625.00, representing accrued interest on the $150,000.00 note as of March 10, 1981."

Thereafter, on May 27, 1981, this court filed its findings of fact, conclusions of law, and final judgment granting the plaintiffs' complaint for relief from the automatic stay "provided the [premises of the motel are] accepted by [plaintiffs] as the 'indubitable equivalent' of their claim against the defendants." In that document, the court found that the balance due to the plaintiffs was $1,153,617.12 and that the evidence cur-

---

1. In a case such as that at bar, in which the parties have demanded considerable time for discovery and for presentation of great masses of virtually undifferentiated evidence on the counterclaim and other tacked-on claims and defenses, it was necessary that the court first hear and decide the complaint for relief from the automatic stay. Otherwise, the 30-day deadline for initial hearing and determination of the matter would surely have been violated. See section 362(e) of the Bankruptcy Code.

rently showed the property to be of approximately equal value, but that the decline in business made it unlikely that the debtors could offer the plaintiffs the statutorily-prescribed "adequate protection" throughout the entire course of the chapter 11 proceedings. Therefore, the court concluded that relief from the automatic stay should be granted, but only on the condition that the plaintiffs forthwith go into the possession of the premises and accept them as the "indubitable equivalent" of their claims in this chapter 11 case. The judgment of this court dated May 27, 1981, contained the following pertinent considerations:

"The evidence which has been adduced, with near unanimity, over the course of three hearings on the issue, has supported the defendants' contention of the near equality of the value of the premises and the indebtedness which is due to the plaintiffs on the security interest. As of March 20, 1981, the date of the initial hearing conducted by the court on this issue, the total amount due on the notes underlying the security interest, including both principal and interest, was the sum of $1,153,617.72. The various opinions of value, rendered by nearly all the experts qualified to render an opinion of such, have been in excess of that amount, as follows:

| | |
|---|---|
| Richard J. Schramm | $1.5 million |
| Hubert Riebold | $1.5–1.6 million |
| Chris Rodgers | $1.158 million |
| Richard J. Schramm (in the hearing of May 16, 1981) | $1.562 million |

\* \* \* \* \* \*

"Still, however, at the conclusion of its hearing of the moiety of the expert evidence, the court could not safely conclude that relief from the automatic stay should be denied. For, the other material factor to be considered is whether the continued decline in business operations and income—of which there is no doubt in the evidence—promises significantly to depreciate the value of the property so that the plaintiffs would not be 'adequately protected' within the meaning of § 361 of the Bankruptcy Code through-

out the long course of these chapter 11 proceedings. 'Adequate protection,' within the meaning of the governing statute, may be said to exist 'when the value of the original property' does not 'decline during the case.' See Legislative History to § 361 of the Bankruptcy Code. But that is precisely what was threatened here by the continued decline in income which, according to the uncontradicted evidence, has been taking place in the operations of Hummel Inn for in excess of a year.

\* \* \* \* \* \*

"The debtors, however, instead have submitted a modification of their proposed plan of reorganization to provide that the property here *sub judice* shall be returned to the plaintiffs as the 'indubitable equivalent' of the claim of the plaintiffs which is based upon the security interest. According to the findings made above, the property is in fact the 'indubitable equivalent' of that claim and the condition which would thereby be imposed upon the grant of relief from the stay is eminently fair and lawful."

When the judgment thus entered was based on the debtors' proposed amended plan, in substance, to restore the plaintiffs to the *status quo* and when, by taking possession in accordance with that order, the plaintiffs necessarily accepted the condition that they waive any further claim on account of the mortgage agreement and underlying notes, the parties clearly accomplished a rescission by mutual consent. Rescission by abandonment of a contract may be accomplished by implied consent as well as by expressed consent as long as, as in this case, the conduct of the parties is positive, unequivocal, and inconsistent with the existence of a contract. See *Walker Transp. Co. v. Neylon,* 396 F.2d 558 (8th Cir. 1968); *In re Reed's Estate,* 414 S.W.2d 283 (Mo.1967). (Even if it could be said that the rescission accomplished was one effected by the final and unappealed judgment of this court of May 27, 1981, the same principles of restitution of the *status quo* apply to judicial rescission as to rescission by agreement.)

■ Under such circumstances, the pertinent contracts between the parties are rendered, by the rescission, void *ab initio*. *Bacon v. Boss*, 290 S.W.2d 207, 208 (Mo.App. 1956). Accordingly, an action for damages for breach of the contract cannot be brought by one of the parties who has mutually agreed to its rescission. *Rubenstein v. Dr. Pepper Co.*, 228 F.2d 528 (8th Cir. 1956).

Damages, in conjunction with rescission, rather are to perform the limited function of restoring one or the other of the parties to the *status quo.* "The very idea of rescinding a contract implies that what has been parted with shall be restored on both sides, and hence the general rule, which is to be reasonably applied . . ., is that a party who wishes to rescind a contract must place the opposite party in statu quo." 17 Am. Jur.2d, *Contracts,* Section 512, p. 994 (1964). See also *Lopp v. Peerless Serum Co.*, 382 S.W.2d 620 (Mo.1964).

■ The narrow question thus presented to the court of bankruptcy under such circumstances was how much, if any, value the defendants had parted with and added to the motel premises in order to bring its worth up to the $1,153,617.12 which was the magnitude of the plaintiffs' claim.[2] Ordinarily, this issue is determined by simple appraisals of the value of the property to be restored or other direct evidence of value. In this case, the value conferred on the premises by the defendants might have easily been established in the course of the general appraisal testimony rendered in connection with the hearing on relief from the stay. The parties, nevertheless, have tried the case as if it were one on the contract and accordingly have briefed the issue of breach of warranty as well as presenting congeries of evidence, testimonial and documentary, wholly without the summarization provided for in Rule 1006 which would seemingly have well befitted and facilitated decision in this case. It has been left to the court to sift through the evidence to determine the admissibility and probative value of the multitude of multifarious documents which have been presented in what can best be described as an oblique effort to demonstrate the damages which should be awarded on the various claims between the parties.

The parties further have sought to have the court decide other issues which beyond cavil must be regarded as having been settled and obviated by the rescission of the contracts between the parties, as outlined above. The defendants thus supplemented their initial counterclaim with additional claims which sought the return of certain monies and food supplies left on hand when the plaintiffs went into possession to accept the motel premises as the "indubitable equivalent" of their claims against the defendants.[3] This was seemingly done with-

---

2. The duty of the defendants to make payments which had been due to plaintiff under the rescinded note is wiped out by the rescission. See 17 Am.Jur.2d section 519, p. 1005 (1980), to the following effect: "Money paid upon a contract which is subsequently rescinded is never forfeited . . . and upon such rescission, the money must be returned to him who advanced it." As to the down payment in this case, however, see note 6, *infra*.

3. In their "answer to plaintiffs' claims dated July 15 and September 9, 1981 and assertion of setoff" the defendants raised the following additional claims: (1) $720.00 "representing the value of the rooms converted to the use of the attorneys, officers, agents or directors of said plaintiff during the course of these proceedings, which rooms were converted by trick and deceit, and for which no payment has been made by defendant"; (2) $2,218.55 "representing mo-

nies defalked and converted from the checking account of defendants' wholly owned corporation, The Hummels, Inc., by agents, officers and employees of said plaintiff and at the instance and request of said plaintiff, its attorneys, officers and directors"; (3) an unstated amount for "disparagement" of the debtors' business as Hummel Inn; (4) $200,000 for the foregoing acts insofar as they resulted in the "loss of the motel premises at 2600 Range Line." Additionally, in the trial of this action, evidence was adduced of certain foodstuffs and other inventory left on hand by the Hummels which were actually used by the plaintiffs after they went into possession of the premises. The claims for "loss of the premises" and for supplies and inventory on hand as of the date of change of possession under this court's order of May 27, 1981, are extinguished by reason of the fact that it was (as is detailed in the text of this memorandum) the defendants who offered the

out regard to the defendants' above quoted particularized proposal granting "unencumbered inventory" to the plaintiffs as well as the real and personal property in which the plaintiffs could claim a valid and perfected security interest [4] and without regard to the principle that a party to a rescinded contract may not continue to accept performance, or to contend for it, after rescission.[5] The same principle forecloses the recovery by defendants for room rentals and other sums which they may have earned in their status as owners and operators of the motel. "A party who rescinds a contract can generally receive nothing beyond restitution. He is not entitled to recover any profit or to enforce any obligation depending for its existence upon any provision in the contract." 17 Am.Jur.2d Section 519, p. 1007 (1980).

This belated barrage of additional and foreclosed claims filed by the defendants prompted return fire by the plaintiffs, who now sought to disregard their agreement to return of the motel premises as the "indubitable equivalent" of their claims by asserting rights to payment for unpaid taxes, sign rentals, attorney's fees, part of the down payment and other like claims on account of the rescinded contract.[6]

---

returned business to the plaintiffs as the "indubitable equivalent" of their claim in these chapter 11 proceedings. The same principle must necessarily apply to the monies which were in the Hummel Inn operating account and which must be considered as a part of the business and premises as of the date of the change of ownership. Also, the liability for room rentals, now alleged as a ground for recovery, must be regarded as an account receivable of the business which was offered to the plaintiffs to wipe out their claim in these chapter 11 proceedings. (And, further, the evidence clearly shows in this regard that the rooms which are complained of by the debtors were granted gratuitously to the agents and attorneys for the plaintiffs by a person whom the debtors themselves left in charge of the premises and upon whom they thereby conferred at least ostensible authority to grant the free room space.) And none of the evidence adduced in this action showed any damages suffered on account of "disparagement," other than "loss of the premises," any claim for which is, as noted above, barred by the defendants' voluntarily offering those premises back to the plaintiffs. And see note 4, *infra*.

4. The claim for restitution of foods products and the like is clearly foreclosed by this provision of the plan of reorganization, which has now been confirmed by the court. Cf. note 19, *infra*. This court believes that the same principles, and general principles attending the event of rescission, also foreclose the claim for the money on hand in the Hummel Inn operating account as of the date when the plaintiff Inn of Southwest Missouri, Inc., under the judgment granting relief from the automatic stay, went into possession of the motel premises. If the money represented profits, the defendants were not entitled to receive them after rescission. See note 5, *infra*. If it did not, it was money which was to be applied to general operations. And the defendants, furthermore, forewent the opportunity of withdrawing it before the take-over by plaintiffs and only asserted this claim as a seeming afterthought in the action at bar.

5. A party cannot "declare ... terminat(ion) of the ... contract and then elect to pursue a course of action totally inconsistent with its initial determination. We suspect that if courts in the past had spoken in the vernacular concerning the applicable principles of law that we would find expressions suggesting the inability of one to have and to eat cake ... The law does not permit (a party) to reserve and to exercise rights which it obviously elected to abandon." *National Landscaping Co. v. Continental Casualty Co.*, 238 F.Supp. 793, 798, 799 (W.D.Mo.1965).

6. The plaintiffs' additional claims were as follows: (1) $10,548.30 as the "balance of purchase money of $10,548.30" still due on the down payment under the rescinded note; (2) $8,437.98, due June 10, 1980, on a promissory note "for stock inventory on the premises"; (3) $24,000 "for the defendants' period of possession (of the motel premises) from March 10, 1980, to June 10, 1981"; (4) $30,000.00 for attorneys' fees incurred in foreclosure and other proceedings; (5) $22,000.00 for certain furnishings and effects allegedly removed from the motel premises by the defendants while they were in possession; (6) $3,000.00 for "certain current operating costs and ... certain income for which at the termination of their possession they were to account, including health insurance for employees, rent from Carter Brown Real Estate, taxes, unemployment insurance and ground rent"; and (7) $40,000 for alleged lack of care and maintenance of the premises and damage done to the premises during the period of the debtors' possession. Three other additional claims were dropped by the plaintiffs in the course of the trial. All the others are foreclosed by the acquiescence of the plaintiffs in the court's judgment of May 27, 1981, granting relief from the stay only if

The court permitted the parties to make a record in this regard, but the superadded claims are so clearly barred by the mutual rescission of the contracts between the parties that the evidence offered on these issues need not be summarized or made the basis for explicit factual findings.[7]

The court must review the evidence, however, which has been submitted by the defendant debtors and which may support a claim for such "damages" or restitution as may be necessary, under the foregoing principles. As noted above, the manner in which this evidence has been presented has made this task an extremely arduous and time-consuming one because the defendants believed themselves to be adducing evidence on their damages for breach of contract. Thus, the evidence of some expenses for certain maintenance, repairs, and minor improvements, the necessity for which may

well have arisen because of a breach or breaches of the warranty in the rescinded contract, may not constitute evidence of an increase in value of the premises, the value of which increase should be restored to the defendants. The expenses of general maintenance and upkeep of the premises such as was necessary to maintain the premises in a condition equivalent to that which existed before being possessed by defendants cannot be restored to them. For that came within their duty to restore the plaintiffs to the *status quo*.[8]

Therefore, the court must review the evidence to determine which of the claims for "damages" or restitution are for improvements which actually enhanced the value of the premises returned to the plaintiffs— which, in effect, were in addition to those which were necessary to restore the *status quo*.[9] In order to do so, the court must

they accepted the restoration of the motel premises to them, as they were, as the "indubitable equivalent" of their claims against the debtors. And, even if it can be said that the plaintiffs' acquiescence in the final and unappealed judgment of May 27, 1981, amounted to judicial rescission, rather than rescission by mutual consent, the same principles apply and it must be regarded that the above claims are components of the $1,153,617.12 which was shown to be the magnitude of the plaintiffs' claims in the automatic stay portion of this action. If they are not components of that total, then they are foreclosed by the doctrine of *res judicata* when the plaintiffs had, in the hearing on relief from the stay, a full and fair opportunity to adduce evidence of these additional claims and their respective magnitudes. The result supported by the application of these principles is eminently fair, for they also work to deny the defendants the return of any portion of the down payment which they made to the plaintiffs. For that amount has already been credited to them in the determination that the value of the property and the magnitude of the claim (reduced by the down payment) are equal to each other.

7. See note 6, *supra*.

8. Any rescinding party must restore the other party to the contract to the *status quo*. If judicial rescission is ordered on the basis of the implied consent of the parties or for other reasons, as for material breach of defendants in failing to make monthly payments to plaintiffs, the court must ensure that the status quo is restored as to both parties. "The very idea of rescinding a contract implies that what has

been parted with shall be restored on both sides, and hence the general rule, which is to be reasonably applied and is subject to certain exceptions, is that a party who wishes to rescind a contract must place the opposite party in statu quo. An attempted restoration of the status quo is an essential part of the rescission of a contract, and in accordance with the general rule requiring restoration, a party cannot rescind and at the same time retain the consideration, or a part of the consideration, received under the contract. One cannot have the benefit of a rescission without assuming its burdens. The rule of restoration applies where a party wishes to rescind for fraud or other cause." 17 Am.Jur.2d *Contracts* section 512 (1964).

9. The fact that the value of the premises was equal to the balance due on the date of rescission does not eliminate the possibility that they may have been worth considerably less when purchased by the defendants. It is that subject which may properly be made the focus of evidence on the counterclaim. In this regard, it must be noted that the court does not consider the question of any decreases in value which may have been worked by the debtors during the period of their occupation of the premises. See note 6, *supra*. This is because whatever decrease was so worked in any respect has already been allowed for by considering the value of the premises as of the date of the hearing underlying the relief from the automatic stay—at the end of the debtors' occupation of the premises.

review the evidence which has been adduced in the hearing of this action which was conducted on October 13–15, 1981, in Joplin, Missouri.

### The Evidence

On February 21, 1980, the defendants Daniel M. Hummel and Gladys Darlene Hummel executed an offer to purchase from the plaintiff Inn of Southwest Missouri, Inc., the motel then known as the Quality Inn in Joplin, Missouri, for a price of $1,300,000.00. *Inter alia,* the written order then executed pertinently provided that:

"Sellers warrant and represent to Buyers that there are no known structural or mechanical defects in the property and that all the equipment will be in working condition on possession date. However, Buyers understand that they are buying said Property in its 'AS IS' condition."

The plaintiff Inn of Southwest Missouri, Inc., presented a "counter-offer to offer of Daniel M. Hummel and Gladys D. Hummel" in which several paragraphs of the defendants' offer were altered, but the above quoted paragraph was not changed, but rather was assented to by the Inn of Southwest Missouri, Inc. Included among the changes made in the counter-offer was a provision to the effect that "Buyers shall assume all leases and Sellers agree to provide Buyers with copies at or before settlement." The counter-offer was accepted in writing by the defendants. Although this court deems the foregoing facts irrelevant according to the principles stated above, they are here recited because the parties carefully made a record in this regard.

10. The unit was inspected by Steve Satterlee of Satterlee Plumbing and Heating and also by Paul Howard.

11. Mr. Hummel was told by Ruby Bruffey on March 24, 1981, or March 25, 1981, that this facet of the air conditioning was insufficient. Robert Bruffey, the chief executive officer of the Inn of Southwest Missouri, testified that he knew of the defect by way of information from Ruby Bruffey. It was his contention, however, that the defect was not a serious one.

12. According to the documentary evidence which has been submitted by the defendants on

Subsequently, the contract was closed and settled and the defendants went into possession of the motel on March 10, 1980. They offer proof of remedied defects in the following portions of the premises.

### Chiller system 1–200 Units

Soon after entering into possession, the defendants discovered defects in the chiller system for some 53 rooms in the rental units numbered 1 through 200. In this particular system, two fifteen ton chillers are contained in a system with compressors and, in substance, manufacture the cool air to be pumped through coils into the individual rooms. According to the Hummels' substantially uncontradicted testimony, if these chillers are not operating at full capacity, the rooms will not be sufficiently cool. The Hummels found several defects in this system: With respect to one of the chillers, a tag connected to it appropriately labeled it as "out of service" and lines from the other chillers were cut off from the chiller tanks. Otherwise, some of the end pipes and wiring were disconnected. Several experts were called in by Mr. Hummel to examine these defects and to attempt to restore the chillers to service. Their testimony supports Mr. Hummel's conclusion that the chiller system was defective and that they were not able to repair it.[10] The inoperability of at least part of the chiller system was known to the responsible agents of the plaintiff Inn of Southwest Missouri, Inc. prior to March 10, 1980.[11] At length, it was necessary for the Hummels to replace the two 15-ton chillers which were not operable with one 35-ton chiller at a purchase price of $8,001.19.[12] For the installation of this particular issue, the following expenses were incurred in this regard:

| | |
|---|---:|
| new chiller | $7,393.00 |
| compressor | 113.98 |
| hydraulic charge | 50.00 |
| flow switch and thermometers | 57.90 |
| freight charges | 106.45 |
| other parts | 330.41 |
| other parts | 113.43 |
| TOTAL | $8,165.17 |

and repair work, the Hummels claim 120 man hours at $4.50 per hour,[13] in addition to the services provided by the experts mentioned above.

### Cooling Tower, 5–600 Units

This apparatus had the intended function of cooling water in the heat exchanges of the compressor and was essential to air conditioning in the rooms numbered 501 through 514 and 611 through 625. It was a box 5 or 10 feet tall and 6 to 8 feet square and filtered the water passing through it to ensure adequate cooling. Shortly after going into operation of the motel and before making any use of the cooling tower, Mr. Hummel discovered that the pump contained in the tower was backsawed off from the pipeline; that the electrical fuse boxes for the pump and fan were removed or disassembled; that, due to these multiform defects, the cooling tower was not operative. Arrangements were made with a repairman, Paul Howard, to effect the necessary repairs. This Mr. Howard accomplished in early June of 1980, completely rewiring the unit, installing the pumps, and undertaking the other measures which were necessary to restore the tower to operation. Additionally, Mr. Hummel and one of his employees spent "about a day" taking the motor component out of the tower and having it repaired, tasks for which no definite, liquidated value has been stated in the evidence.[14] A labor bill was paid to Mr. Howard for the service and a new pump was also required for this repair work.[15]

### Boiler

The function of the boiler which is the subject of this action is to heat an 80–room sector in the "rear building" where the units are numbered in the 300, 400, 500 and 600 series. After takeover of the premises, Mr. Hummel discovered that water was leaking out of the bottom of the boiler. This discovery was belated, according to the testimony of Mr. Hummel, because the boiler was in fact not leaking at the time of the takeover primarily because of the expansion of the pipes which had taken place during the intermittent but regular use of the boiler during the month of March 1980. Shortly after discovery of the leak, Mr. Hummel employed a plumber, one Satterlee, to inspect the boiler sometime in April 1981. He submitted a bid and offer to replace the boiler. By that time, however, the plaintiffs had commenced the foreclosure proceedings in the state court which ultimately gave rise to the defendant's instituting these chapter 11 proceedings. For his inspection of the boiler, Mr. Satterlee was paid the sum of $50.00.

### Room heat exchangers

These "room heat exchangers" are described in the evidence as apparati essential to the cooling of some 103 rooms in the motel, composed of coils through which hot and chilled water pass combined with a radiator and fan. According to the uncontradicted testimony of Mr. Hummel, the problem with the heat exchangers was that they "were blocked from putting out cold air by oxidization materials." The result

---

Of this total, however, the $50.00 hydraulic charge and the freight charges of $106.45 cannot, under the principles asseverated in the text of this memorandum, be considered as adding anything to the value of the premises. And some $7.53 of the miscellaneous parts does not appear, under the same principles, to add any significant value to the premises. Subtraction of these amounts yields the total in the text, $8,001.19.

**13.** Generally, in considering evidence of the man hours of work which were consumed in maintenance, repairs, or improvement, the court must be mindful that it is the amount by which the premises were enhanced which constitutes the measure of restitution to be accorded. These values, then, are irrelevant. Further, the evidence which has been adduced in this regard is very sketchy, leaving the issue of its value almost wholly to the realm of speculation.

**14.** See note 13, *supra.*

**15.** The Howard bill for intangible labor can only be considered to come within the principles stated in note 13, *supra.* The only evidence as to the price of a pump (although Mr. Hummel testified without contradiction that he paid the price) is the sum of $224.92.

was that, after the Hummels had installed the new chiller system and restored the air conditioning to operability, still some 25% of the rooms were not cooled. In order to repair this defect, it was necessary for the Hummels to employ Tom Jones, Tom Jones' 18-year-old son, and Jack Booth to "blow out" the exchangers over a two week period. By this method, only part of the problem was solved. According to the testimony of Mr. Hummel, sediment in the heat exchangers continued to "move around" and it therefore became necessary to utilize an air compressor and an adapter to "blow out" the coils, a process which, according to Mr. Hummel, had to be repeated 6 or more times per week. But the result was that the exchangers were "pretty well operative by the end of summer." In the course of the enterprise, Mr. Hummel purchased some 64 blowers and motors and pumps, expending in total, according to the evidence, $3,804.36, not all of which can be regarded as enhancing the value of the premises.[16]

### Exhaust fans in the commercial building (the restaurant-lounge facility)

The exhaust fans concerning which the evidence was offered at trial were those which were to remove stale air from the lounge area, which was either adjacent to or one with the motel bar facility, and the restaurant. But the Hummels discovered that patrons in the bar area continually complained of stale smoke in the lounge. Upon inspection, Mr. Hummel discovered four fans on the roof of this area "rotted solid and burned out." Additionally, the fan above the dishwasher was "burned out," as the result of which steam was not being moved out of the room; and the fan above the coolers had the connecting vessels bent off of it, with the result that, in Mr. Hummel's words, "the power was not even hooked up to it." Additionally, there were four small fans in ventilated bathrooms in respect to which Mr. Hummel discovered in the latter part of March that the motors were burned out and rusty. The burned out motors were all replaced and other necessary repairs were undertaken by Messrs Hummel, Jones and Booth, at an indefinitely evidenced out-of-pocket expense. The evidence of the expense incurred for any tangible improvement of the premises is wholly speculative in this regard.[17]

### Rooftop Air Conditioning Units for Commercial Building

### (1) "Spanish Main" Air Conditioning Unit

The "Spanish Main" was a large meeting and dining room occupying the easternmost portion of the commercial building. In early or middle April of 1981, the Hummels discovered that, with respect to the air conditioning unit for this room, the relays were all burned out and the wires bypassed. Therefore, the air conditioning system was not operative and had not been operative since the Hummels' acquisition of the property. Air conditioning repairmen were called in to inspect the system and they advised Mr. Hummel that the unit could not be repaired. In part, this was because the system was an obsolete or obsolescent gas heating and air conditioning system which

16. The documentary evidence of the purchase and the prices paid for the purchase of these parts is very imperfect. The plaintiffs have objected to its admissibility principally on the grounds that the bills offered in evidence do not show actual payment. But payment is a subject on which the contents of a document are not conclusive; it is a fact which a witness may testify to orally with or without the corroboration of documentary evidence. And Mr. Hummel has testified without contradiction that he "purchased" 64 blowers and motors. His summary of the documents in this regard purports to show some $3,804.36 expended for 28 mowers and 45 blowers. Under the circumstances, the court must give credence to a rounded-off figure to represent the expenditures in this regard, and the figure should generally be further mitigated by the recognition that normal wear and tear seems to require the periodic replacement of at least some of these parts. Therefore, the figure of $3,000 is found by the court to be the proper figure.

17. In this regard, no documentary evidence was sufficiently identified to these repairs or improvements. Mr. Hummel simply testified that the bills were somewhere among bills from Electric Motor Supply Company which may or may not have been in evidence.

could not be only partially replaced. Therefore, in June 1980, the entire unit was replaced at a cost of $2,339.12.[18]

### (2) *Compressor, Restaurant Unit*

At the time of advent of warm weather, Mr. Hummel also discovered that the compressor for the "Grenada Room" and restaurant was not operative. It would not run when he initially attempted to switch it on. Therefore, the restaurant was not adequately cooled until a new compressor was installed as a cost of $626.55.[19]

### (3) *Lounge Air Conditioning Unit*

Sometime in May 1980, Mr. Hummel discovered that the lounge air conditioner would not start. A repairman named Mike Vylonis attempted to repair the unit, but was unsuccessful. Although the Vylonis project resulted in the unit's running, it never produced any cold air. Therefore, the entire unit was replaced and a heat pump was installed in July 1980 at a total cost of $2,798.18.[20]

### *Room heat exchanger; condensation drain pan and drain system generally*

In respect of some 53 rooms in the 100 and 200 series units, Mr. Hummel discovered in "the early part of the hot season," in about June 1980, that the pipelines leading to the drains were in "complete disarray"; that hoses leading to drainpipes had been cut so that water was emptied into a "pipe chase" (a three-foot alley containing all conducts to and from the units). The result was that water ran back into the closets of the rooms and mildewed. It was necessary, according to Mr. Hummel's uncontradicted testimony, "essentially to rebuild the system" at a considerable expense of hoses, pipes and labor.[21]

### *Kitchen Equipment*

The equipment which is claimed to have been inoperative in the motel kitchen is as follows: four deep fryers, a microwave oven, a large baking oven, and a cookstove.

(1) *Deep fryers.* With respect to the deep fryers, the evidence adduced by the defendants is quite fuzzy and inconclusive as to the nature and extent of the defects, their effect on operations, and the extent and cost of any necessary repairs. According to Mr. Hummel's testimony, two of the four deep fryers in the motel's kitchen were operative when he initially took custody of the premises. Of these, one was "leaking through" and "not safe." Therefore, the Hummels "had to limit ourselves to the use of one." In many, if not all respects, however, this proved to be sufficient because of the change made by the Hummels from a buffet-style restaurant to a regular restaurant. The Hummels expended $50 each for the steam cleaning of three of the fryers,[22] but these efforts are claimed to have been insufficient to repair the deep fryers.

(2) *Microwave Oven.* According to Mr. Hummel's uncontradicted testimony, the control valves were inoperative and the oven was otherwise in a "hazardous" condition and had to be replaced. Mr. Hummel advised Ruby Bruffey, an agent of the plaintiff Inn of Southwest Missouri, Inc.[23] within a week of his taking over the prem-

---

18. Again, evidence was presented of labor and installation charges which are ineligible to be considered as enhancements of value of the premises. See note 13, *supra.* But some of the labor is inseparably lumped with the cost of the "materials" in the documentary evidence supporting the claim.

19. Again, labor and materials are lumped together without giving subtotals in the documentation supporting the claim. See note 13, *supra.*

20. The documentary evidence shows the cost of the installed materials, considered apart from labor, as $245.03. The cost of the heat pump was $2553.15.

21. Again, however, the evidence which shows the costs of any materials installed has not been sufficiently identified to the oral testimony of Mr. Hummel. Further, this type of work and replacement of worn out parts must, under all the evidence, be considered as maintenance as opposed to improvement of the premises.

22. These expenditures must be viewed under the principles set forth in note 13, *supra.*

23. According to the relevant testimony, Ruby Bruffey remained on the premises during the initial part of the Hummel takeover for the purpose of aiding the Hummels and familiarizing them with the premises and operations. Her employment, however, was originally, at

ises of this condition. Competent repairmen could not fix it and it had to be replaced at a cost of $312.32.[24]

(3) *Large Baking Oven.* This piece of equipment had been "burned out internally" according to Mr. Hummel, prior to the time of his takeover of the premises. Repairmen were retained to inspect this equipment, but it was neither repaired nor replaced.

(4) *Cookstove.* Only two of the six burners on the cookstove in the kitchen were usable when the Hummels assumed control of the premises. The oven was not usable. And the chef, at the time of the Hummels' takeover of the business, told Mr. Hummel that the cookstove "wouldn't work." An employee of the Hummels replaced certain parts and got the burners going again, but, according to Mr. Hummel, the oven was never usable during the period when he occupied the premises.[25]

## Laundry Equipment

According to Mr. Hummel's uncontradicted testimony, defects in the laundry were in five categories: (1) no hot water; (2) one of the washing machines was disassembled; (3) three other washing machines had other sundry defects; (4) three dryers were defective; and (5) two manglers were defective.

(1) *Lack of hot water.* Mr. Hummel was informed by the staff of the existence of this defect the day after he took over the premises. According to Mr. Hummel's testimony, restoration of the availability of hot water was "not a major repair job"; rather, some minor repairs were made by his employee Tom Jones on a pump motor at a relatively minimal cost which all must be categorized as necessary maintenance.

(2) *Disassembled washing machine.* The parts from this disassembled washing machine had been used as replacement parts for the other machines prior to the time when the Hummels took possession of the premises. The evidence does not sufficiently disclose whether any replacement machine was procured by the Hummels and, if so, at what cost.

(3) *Other washing machines.* On a second machine, the timers didn't work and they had to be operated manually. On a third machine, the doors had to be propped shut in order to keep water from leaking out and had to be manually fed and operated. The defects in these washing machines, according to the testimony of Mr. Hummel, deterred the operations which were necessary daily to clean the linen for some 133 motel rooms.

(4) *Three dryers.* The timers did not work on any of these dryers, nor did the door latches; the door on one was held shut only by means of improvised wiring; and none of them, according to Mr. Hummel, functioned as they should. None of them, however, was replaced during the Hummels' brief ownership of the premises. Another used dryer was purchased but not installed and the Hummels' employee Tom Jones did patchwork to keep the existing dryers operable. One of the dryers caught fire several times and the timer on another had to be turned by hand.

(5) *Two manglers.* These devices were used to iron dining room table cloths and the like. They were not used by the Hummels, according to their testimony, and accordingly were neither repaired nor replaced.

## Swimming Pool

In April 1980, the Hummels discovered that one of the filters in the swimming pool

---

least, with the plaintiff Inn of Southwest Missouri, Inc. See note 11, *supra.*

**24.** Bills have also been offered in evidence by the defendants Hummel to prove that other kitchen repair and maintenance expenses were made—the restoration of elements and a timer to a toaster ($53.10) and a pump and timer to another appliance ($128.13), but these bills affirmatively show on their faces that these were

charged expenses and, further, they appear to be comparatively minor repairs of no substantial magnitude in enhancing the value of the premises. See note 13, *supra.*

**25.** The maintenance thus effected must be viewed and interpreted according to the principles set out in note 13, *supra.*

was inoperative; that it was necessary to repair or replace this in order "to have enough filtering capacity" and that one of the inlet pipes was leaking, resulting in a loss of significant portions of water. The necessary repairs were performed by Mr. Hummel and his employee, Tom Jones.[26] Evidence as to the cost of the rather minor replacement parts has not been clearly presented.

### Cash Registers

In respect to the "main" cash register, the plaintiff Inn of Southwest Missouri, Inc., by counsel, admitted in open court that the repairs, in the sum of $1,620.24 were within the warranty and should be paid.

With regard to the "main cash register" in the bar, Mr. Hummel could not say whether it had initially been inoperative, but he had had a "Neosho man" do repair work on it in approximately May 1980. On two other cash registers, according to Mr. Hummel, the keys would frequently stick and it was necessary to have a service man work on them several times. Again, however, he did not know whether these defects already existed at the time of his taking over the premises.

### The Roof

The Hummels also contend that the roof on the motel was defective and leaking in three places when they took over the premises. The "worst" leak was in the area over the motel office and was repaired by Mr. Hummel and his son by application of "tar of several different consistences" which they had purchased with several other supplies.[27] The same is true of the leak over the lounge.

### Carpet

Defendants additionally complain of having to replace some of the carpet which was on the floor of the motel at an expense of $374.66 plus labor costs of himself and Tom Jones.

Reviewing the foregoing under the principles which have been asseverated above leads this court to the conclusion that the value of $23,953.94 was added to the premises through expenditures proven to have been made by the Hummels. This composite is a total of the following elements:

| | |
|---|---|
| 35 ton chiller | $8001.19 |
| pump | 224.92 |
| room heat exchangers | 3000.00 |
| Spanish Main air conditioner | 2339.12 |
| compressor | 626.55 |
| lounge air conditioner | 2798.18 |
| microwave oven | 312.32 |
| washer and motor | 5031.42 |
| adding machines | 1620.24 |
| TOTAL | $23,953.94 |

From this total must be subtracted the $2339.12 on the Spanish Main air conditioner and the $626.55 attributed to the compressor, for these sums contain an unknown quantity attributable to labor costs. The resulting difference is $20,958.27.

The above principles have dictated that all the other repairs and maintenance be disregarded as ordinary upkeep not having in any significant way enhanced the value of the premises which were returned by defendants to the plaintiff. And the award thus dictated by the above considerations and calculations must, as noted above, be regarded as simple restitution rather than one made for breach of warranty, or fraud, or other tort.

The correctness of the amount of the award is proven, not only by the above considerations and calculations, but by a view of the evidence as a whole, which shows that the defendants sought to prove the incurring of expenses exceeding $50,-000. It does not seem extraordinary to regard ⅗ of that amount to be the expenses which might normally have been anticipated in maintaining the premises over the 14-month period involved in this case. Rather, the sum of approximately $30,000

---

**26.** This repair work, this court believes, clearly must be characterized as maintenance as opposed to additions to the premises which in any substantial degree enhanced its value.

**27.** See note 26, *supra.*

would seem to be what might be reasonably expected as the cost of upkeep of a motel of the age, complexity and size of the premises in this case.

In one respect the plaintiffs have offered a contention which, if satisfactorily proved, would show that the defendants in fact reduced the value of the premises during their tenancy. That was a contention that the defendant Daniel Martin Hummel injected muratic acid into the air conditioning system. In this regard, evidence was adduced which showed that the injection of muratic acid would likely have been harmful to the system, but the evidence was inconclusive and unpersuasive as it was attempted to show that Mr. Hummel actually injected the substance to any degree which would have caused any measurable harm.[28] Further, the premises were valued by appraisal testimony as of a time near the end of the Hummels' occupancy and any reduction in value must be regarded as having been thereby taken into account.[29]

And, as noted above, the other claims advanced by the plaintiffs, steming from contractual obligations, are foreclosed by the rescission of the underlying contractual obligations, as are the remaining claims prosecuted by the defendants.

It is therefore, for the foregoing reasons,

ORDERED, ADJUDGED, AND DECREED that the defendants Daniel Martin Hummel and Gladys Darlene Hummel have and recove, by way of restitution for value had and received, the sum of $20,958.27 from the plaintiff Inn of Southwest Missouri, Inc.[30]

---

**28.** A crucial hiatus was left in the testimony which was adduced in this regard. Those who knew that Mr. Hummel injected a substance into the system, including Mr. Hummel, were unsure of its properties or whether it was injected to the extent to cause any damage. On the other hand, the expert who knew the properties of muratic acid didn't know whether that was the substance injected.

**29.** See note 9, *supra.*

**30.** The values are gauged as of the "effective date of the plan" which must be regarded as the date of the hearing on the complaint for relief from the automatic stay, the date as of which the rights of parties commenced to be materially affected by its terms.